# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

**AMANDA L.,**

                    **Plaintiff,**

**v.**                                          **8:18-CV-01221 (NAM)**

**ANDREW M. SAUL,**
**Commissioner of Social Security,[1]**

                    **Defendant.**

_____

**Appearances:**

Victoria M. Esposito, Esq.
Legal Aid Society of Northeast New York
95 Central Avenue
Albany, New York 12206
*Counsel for Plaintiff*

Lucy Weilbrenner, Esq.
Social Security Administration
625 JFK Building
15 New Sudbury Street
Boston, Massachusetts 02203
*Counsel for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

      Plaintiff Amanda L. filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),

challenging the denial of her application for Social Security Disability Insurance ("SSDI") and

---

[1] Plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of the Social Security Administration. (Dkt. No. 1). Andrew M. Saul became the Commissioner of Social Security on June 17, 2019. Because Nancy A. Berryhill was only sued in her official capacity, Commissioner Saul is automatically substituted as the named defendant in this action. Fed. R. Civ. P. 25(d). The Clerk of Court is respectfully directed to amend the caption.

Supplemental Security Income ("SSI") benefits under the Social Security Act ("the Act"). (Dkt. No. 1). The parties' briefs are presently before the Court. (Dkt. Nos. 14, 16). After carefully reviewing the administrative record, (Dkt. No. 11), the Court affirms the denial decision.

## II.   BACKGROUND

### A.  Procedural History

Plaintiff applied for disability benefits in September 2010, alleging that she had been disabled since September 7, 2009. (R. 223–29). Plaintiff alleged disability due to Crohn's disease, ankylosing spondylitis, panic disorder, kidney stones, vulvar carcinoma, and depression. (R. 260). The Social Security Administration ("SSA") denied Plaintiff's application on December 7, 2010. (R. 97–100). Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ"). (*See* R. 101–02). The hearing was held on March 16, 2012 before ALJ John P. Ramos. (R. 56–95). Plaintiff appeared at a second hearing on March 7, 2013, again before ALJ Ramos. (R. 30–57). Plaintiff was represented by counsel at both hearings.

ALJ Ramos issued an unfavorable decision on March 22, 2013. (R 13–23). Plaintiff timely requested review by the Appeals Council. (R. 10–12). The Appeals Council denied review on May 5, 2014. (R. 1–4). This Court then remanded the matter upon stipulation of the parties for a new hearing. (R. 1311–13). The Appeals Council directed the Commissioner to: (1) further evaluate the severity of Plaintiff's impairments; (2) reconsider Plaintiff's subjective complaints; (3) further consider Plaintiff's maximum residual functional capacity ("RFC"); and (4) obtain additional evidence from a vocational expert ("VE") if necessary. (R. 1316–17).

The ALJ issued a second unfavorable decision on August 25, 2016. (R. 1223–32). Plaintiff's subsequent request for review by the Appeals Council was denied. (R. 1146–50). Plaintiff commenced this action challenging the decision on October 12, 2018. (Dkt. No. 1).

### B. Plaintiff's Background and Testimony

Plaintiff was born in 1986. (R. 256). She attended school until the eighth grade and received a GED in 2005. (R. 62–63). Plaintiff testified that she had previously worked as a produce clerk at a grocery store, as a cashier and sales clerk at various retail stores, and as a delivery driver for a newspaper company. (R. 34–35, 63, 67–70). Plaintiff stated that she reduced her hours and eventually stopped working all together because she "became more ill," and "[w]as in too much pain." (R. 64). She has not engaged in substantial gainful activity since September 2009. (R. 256).

Plaintiff provided hearing testimony about her medical conditions in March 2013 and April 2016. (R. 30–55, 56–95). In March 2013, Plaintiff testified that she had to stand through her four to six hour shifts at the grocery store, and that she could only stand for about an hour without pain. (R. 64–65). Plaintiff claimed that she could no longer perform the lifting component of her job, which involved lifting boxes of produce weighing twenty to thirty pounds. (R. 65–66). Plaintiff claimed that she was let go from a previous job at a home improvement store because she missed too much work due to her Crohn's disease. (R. 70). Plaintiff then tried working part-time at a clothing store but alleged that her employer was unable or unwilling to accommodate her physical limitations in standing, lifting, and bending. (R. 70–71).

Plaintiff stated that she tried to work on "bad days," but sometimes needed to leave early due to the pain. (R. 75). She stated that she missed work at least twice a month due to

her back pain. (R. 79–80). Plaintiff estimated that she experienced "flare ups" of Crohn's disease about ten times per year, despite adhering to her prescribed medication. (R. 83). She reported that she was disciplined by her employers for spending too much time in the bathroom. (R. 82–83).

At Plaintiff's hearing in April 2016, she reported that her health had worsened and that she was no longer able to work at all. (R. 1255). She stated that she suffered from flare-ups about two weeks each month which prevent her from walking. (R. 1255, 1261). She said that she was constipated about half the time and suffered from severe diarrhea half the time. (R. 1255–56). She estimated that she had diarrhea about every other week, which caused her to spend hours in the bathroom. (R. 1260). She reported that she took Humira every two weeks, but it made her sick very easily. (R. 1258, 1260–61).

In 2015, Plaintiff reported that she lived with her boyfriend and her three young children, ages two, six, and twelve. (R. 1640). With regard to daily activities, Plaintiff said that she prepared meals daily and was able to do laundry and complete regular housework. (R. 272). She reported no limitations to leaving the home and stated that she shops for groceries once a week. (R. 273). She stated that she spends her days caring for her children, watching television, reading, and socializing with family and friends. (R. 271, 274). Plaintiff reported that she showers four times a week, dresses daily, and has no problems with personal care. (R. 1639).

### C. Medical Evidence of Disability

Plaintiff claims that her disability stems from conditions including Crohn's disease, ankylosing spondylitis, panic disorder, kidney stones, vulvar carcinoma, and depression. (R.

260).  Plaintiff has struggled with these conditions since 2009 and has received treatment from a number of medical providers.  (R. 256, 263–68).

### 1.  Dr. Luis Canales, Gastroenterologist

Plaintiff first presented to Dr. Canales seeking treatment of her abdominal issues in July 2009.  (*See* R. 756–91).  At that point, Dr. Canales assessed that her symptoms "may reflect several possibilities," including irritable bowel disease ("IBD"), irritable bowel syndrome ("IBS"), and "biliary colic."  (R. 758).  Plaintiff had an abnormal CT test in August 2009, which showed "small bowel changes."  (R. 760).  Dr. Canales diagnosed Crohn's disease and ordered a capsule endoscopy.  (R. 760–61).  Dr. Canales later described the results of that endoscopy as "consistent with presumed Crohn's" and continued to prescribe Pentasa.  (R. 762).  Plaintiff continued to experience abdominal pain and diarrhea several times a month, as well as increased heartburn and acid reflux.  (R. 764–66).

In May 2010, Plaintiff reported experiencing constant abdominal pain, which became slightly worse with meals.  (R. 768).  She was having three to five bowel movements per day, her appetite had decreased, and she had lost a few pounds.  (R. 768).  Dr. Canales noted that Plaintiff's liver function testing was also abnormal.  (R. 768–69).  Based on his examination and the test results, the doctor concluded it was likely that Plaintiff had Crohn's.  (R. 769).

In December 2010, Plaintiff was taking Humira for her ankylosing spondylitis.  (R. 1111–12).  She stopped taking Humira during her pregnancy, but experienced frequent bouts of "nausea, vomiting, diarrhea and cramping mid abdominal pain" after resuming it.  (R. 2344).  Plaintiff continued treatment with Dr. Canales through 2016.  (R. 2338–49).  The treatment records indicate that she suffered intermittent cramps, constipation, nausea, vomiting, and diarrhea.  (R. 2338, 2342–43).

## 2. Elizabeth Logalbo, D.O., Primary Care Provider

Plaintiff received her primary medical care from Dr. Elizabeth Logalbo from 2010 through 2014. (R. 792–844, 961–1015, 2438–2558). Dr. Logalbo's treatment notes show that Plaintiff started reporting abdominal and back pain in 2010. (R. 797). In August 2010, Dr. Logalbo referred Plaintiff to a rheumatologist, ordered a spinal MRI, and gave her a new hydrocodone prescription after her pain did not respond to Ibuprofen. (R. 795–96). The MRI revealed a "right paracentral disc herniation at the 5-1 disc-space level," but also that "there [was] normal alignment and position of the bones in the LS spine . . . [with] no signs of any other disc herniation." (R. 561, 794). Dr. Logalbo prescribed a course of hydrocodone, an anti-inflammatory, and physical therapy. (R. 794). A pelvic MRI from January 2011 showed "findings consistent with sacroiliitis secondary to ankylosing spondylitis." (R. 1011).

Plaintiff saw Dr. Logalbo through 2014 and continued reporting back pain, abdominal pain, and gastrointestinal difficulties. (*See generally* R. 792–844, 961–1015, 2438–2558). Plaintiff reported some improvement in her condition while taking Humira, noting that it helped her with daily activities. (R. 971). In March 2011, she reported that her back pain had increased and that she had increased stiffness and decreased flexibility, particularly in her knees. (R. 968). She stated that she relied on hydrocodone to attend work and complete the tasks her work required. (*Id.*). Plaintiff exhibited limited range of motion in her neck and back, and had frequent positive straight leg raise tests. (*See* R. 962, 965–68, 2462, 2455). In September 2011, Plaintiff reported that her pain level was five out of ten, and noted that the pain medication allowed her to carry out activities of daily living. (R. 961). Dr. Logalbo's treatment notes indicate a continued diagnosis of chronic lower back pain and noted Plaintiff's intermittent gastrointestinal issues. (*See generally* R. 2438–2558).

### 3. Adirondack Medical Center, Rheumatology

In November 2010, Plaintiff established care with Dr. Handler at the Adirondack Medical Center. (R. 340–41). Dr. Handler diagnosed Plaintiff with ankylosing spondylitis, based on her musculoskeletal problems together with the B27 antigen, Crohn's disease, and her "perpetual well tolerated nonpurulent 'vaginitis.'" (R. 340). Dr. Handler prescribed Humira to help control Plaintiff's Crohn's disease and ankylosing spondylitis. (340). By January 2011, monthly Humira treatments had ceased to be effective, so she had begun receiving them weekly. (R. 1018). The medication was controlling her Crohn's disease, but it only helped her ankylosing spondylitis for about three days after each injection. (*Id*.). Dr. Handler noted that Plaintiff had difficulty rising from sitting, could not stand comfortably, and had difficulty with all motion. (R. 1018). Dr. Handler changed her medication from Humira to Enbrel. (R. 1018). Her first weekly dose of Enbrel made her "dramatically" better, but its efficacy for both her ankylosing spondylitis and her Crohn's waned quickly. (R. 1020).

In August 2011, an MRI showed "severe degenerative disc disease," a subligamentous disc herniation indenting the nerve roots, and sacroiliac joint changes "consistent with the clinical diagnosis of ankylosing spondylitis." (R. 978–79). Treatment notes from January 2012 indicate that Plaintiff's pain was "continuous" and exacerbated by standing, walking, and the cold temperatures at her job. (R. 1035–37).

In November 2013, Dr. Jonathan Krant took over Plaintiff's care at Adirondack Medical Center. (R. 2230–32). Dr. Krant continued Plaintiff's diagnoses and medical regimen. (R. 2230–32). In May 2015, he re-started Plaintiff's Humira and renewed her Oxycodone prescription. (R. 2222–29). By February 2016, Plaintiff reported that the Humira was

controlling her Crohn's symptoms but was not controlling her hip and back pain. (R. 2560). Dr. Krant noted that:

> [Plaintiff] was given #240 oxycodone by her new PCP on 02/05 and requests a refill of this IR drug today. She cannot provide her pill bottle (though she stated to me "it is out in the car") and questions my insistence for a urine drug screen (mandatory given the inconsistencies of her story). I am very concerned about potential drug diversion and/or non-compliance. She is requesting medication almost two weeks before a refill is due. And there is no adaquate [sic] explanation as to why she sought a second provider for opiate prescription.

(*Id.*). A random urine toxicity screen was performed and returned negative for opiates. (R. 2559). However, in June 2016, Dr. Krant wrote a letter explaining that his concerns had been allayed by a second urine screen (March 2016) which was positive for opiates. (*Id.*).

Treatment records indicate that Plaintiff continued to see Dr. Krant through October 2016. (*See* R. 1208–19). On October 20, 2016, Dr. Krant completed a questionnaire regarding Plaintiff's functional capabilities. (R. 1208–12). While he left the majority of the form completely blank, he noted that while Plaintiff's symptoms would "constantly" interfere with her attention and concentration, she was capable of performing "low stress work." (R. 1209). There were no other work-related restrictions indicated on the form. (R. 1210–11). He offered no assessments of Plaintiff's ability to sit, stand, or walk, nor did he provide any predictions as to how often Plaintiff's conditions might cause her to be absent from work. (*Id.*).

#### 4. Dr. Lorensen, Consultative Examiner

In February 2015, Plaintiff presented to Dr. Elke Lorensen for a consultative physical examination. (R. 1638–41). Plaintiff reported that her primary complaint was back pain that is aggravated by sitting, standing, and bending. (R. 1638). Dr. Lorensen noted that Plaintiff's gait and stance were normal, she walked without an assistive device, and she did not appear to

be in acute distress. (R. 1639). Plaintiff was able to rise from a chair without difficulty, she did not need assistance changing for the exam or getting on and off the exam table. (*Id.*).

Dr. Lorensen noted that Plaintiff's bowel sounds were normal. (R. 1640). Plaintiff demonstrated 60-degree lumbar spine flexion, lateral flexion of 30 degrees bilaterally, and full rotary movement bilaterally. (*Id.*). Her hip and knee flexion were 90 degrees bilaterally, and she demonstrated full range of motion in her ankles bilaterally. (*Id.*). Dr. Lorensen noted that Plaintiff's joints were "stable and nontender," she exhibited "[n]o evident subluxations, contractures, ankylosis or thickening," and she had full grip strength. (*Id.*). Plaintiff's straight leg test was negative. (*Id.*). In sum, Dr. Lorensen concluded that Plaintiff had "no gross limitations sitting, standing, walking, and handling small objects with [her] hands," and had "moderate restrictions bending, reaching and lifting." (R. 1640).

### 5. Dr. Charles Plotz, Nonexamining Medical Expert

In May 2012, medical expert Dr. Charles Plotz examined Plaintiff's medical records and provided a Medical Source Statement assessing Plaintiff's work-related capabilities. (R. 1135–43). Dr. Plotz specializes in rheumatology and is board-certified in internal medicine, which includes gastroenterology. (R. 40). Based on his review, Dr. Plotz assessed that Plaintiff would be able to frequently lift and carry 11 to 20 pounds, and occasionally lift and carry 21 to 50 pounds. (R. 1135). He determined that Plaintiff could walk for four hours at a time and sit and/or stand for six hours at a time. (R. 1136). Dr. Plotz found that none of Plaintiff's impairments met or equaled any impairments described in the SSA's Listing of Impairments. (R. 1142). Dr. Plotz wrote that:

> The bulk of her medical file consists of her pregnancies [ ], kidney stone and occasional mild diarrheal episodes leading to [a] questionable diagnosis of Crohn's disease of the jejunum. Virtually all radiographic studies of g.i. tract and spine are normal. Tests for

> inflammation such as sed. rate and CRP are repeatedly normal. She
> is noted to take hydrocodone 6/day and this is known to be highly
> addictive. She takes care of her children and does normal activities
> of daily living.

(R. 1143).

At Plaintiff's first hearing in March 2013, Dr. Plotz testified that he disagreed with Plaintiff's treating physicians' diagnoses of ankylosing spondylitis and Crohn's disease. (R. 46). Dr. Plotz stated that the objective medical evidence and Plaintiff's complaints did not support ankylosing spondylitis because "a little bit of strain in the lower back" is "a very common condition." (R. 45–47). He explained that Plaintiff could not have ankylosing spondylitis because there was no evidence of "rigidity of the spine starting in the lower vertebrae in the spine and ascending." (R. 51). Regarding her gastrointestinal complaints, Dr. Plotz stated that Plaintiff's symptoms were not consistent with Crohn's disease because she only had "occasional, mild episodes" of inflammation. (R. 47–48). Dr. Plotz described Crohn's disease as "irritable bowel syndrome in spades," noting that Plaintiff's symptoms would need to show "consistent diarrhea, weight loss, and weakness." (R. 51). He concluded that Plaintiff "may have the very beginnings of a rather mild Crohn's disease, which is almost asymptomatic." (*Id.*).

### D. ALJ's Decision Denying Benefits

On August 25, 2016, ALJ Ramos issued a decision denying Plaintiff's application for disability benefits. (R. 1224–32). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since September 7, 2009, the alleged onset date for her disability. (R. 1227).

At step two, the ALJ found that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff had two "severe" impairments: irritable bowel syndrome and ankylosing spondylitis. (*Id.*).

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or combination of impairments that met the criteria for one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 1228–29). Specifically, the ALJ concluded that Plaintiff's ankylosing spondylitis did not satisfy the statutory requirements to find disability under Listing 1.02, and her gastrointestinal condition did not meet the requirements of Listing 5.06. (*Id.*).

At step four, the ALJ determined that Plaintiff "has the [RFC] to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)[2] except she can only "occasionally climb ladders/scaffolds and work at unprotected heights." (R. 1229). The ALJ stated that the RFC determination "is based on the opinions of Charles Plotz, M.D., and Elke Lorensen, M.D., and their opinions were given great weight." (*Id.*). The ALJ also stated that the RFC was supported by treatment notes, clinical findings, and diagnostic testing. (R. 1231). The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 1230). The ALJ found that the "diagnostic imaging does not support her significant allegations," noting that objective medical tests indicated "normal radiographic studies and normal tests for inflammation." (*Id.*). The ALJ further noted

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *See* 20 C.F.R. §§ 404.1567(b) and 416.967(b).

that her "colonoscopy was unremarkable/normal, a CT scan of her abdomen identified only mild issues and an MRI of her abdomen was normal." (*Id.*).

Regarding her physical capabilities, the ALJ noted that her "treatment providers [ ] regularly critiqued her sedentary lifestyle and advised her to perform regular exercise." (R. 1230). The ALJ found that Plaintiff's alleged limitations were inconsistent with her significant daily activities, including her ability to care for her young children, prepare meals, do laundry, drive, shop, manage money, read, watch television, and spend time with friends. (R. 1230–31). The ALJ noted that Plaintiff worked part-time until just prior to her first hearing. (R. 1230).

The ALJ gave great weight to the opinion of the consultative examiner Dr. Lorensen, who found that Plaintiff had "no gross limitations for sitting, standing, walking and handling small objects," and "moderate limitations for pending, reaching and lifting." (R. 1230). Dr. Lorensen also found that Plaintiff had "normal gait, and ability to rise from a chair without difficulty, somewhat restricted range of motion of the lumbar spine, slightly restricted range of motion of the hips and full strength in the upper and lower extremities." (*Id.*).

The ALJ also gave great weight to the opinion of the medical expert, Dr. Plotz, because his opinion was "based on objective evidence of record," and was "consistent with that of Dr. Lorensen." (R. 1229). The ALJ noted that Dr. Plotz found Plaintiff's diagnoses to be "questionable," and that he found that she had "normal radiographic studies and normal tests of inflammation such as erythrocyte sedimentation rate and c-reactive protein." (*Id.*).

In sum, the ALJ found that Plaintiff was capable of performing her past work as a produce clerk and a cashier, which the ALJ described as "light exertion jobs." (R. 1231). Therefore, the ALJ concluded that Plaintiff was "not disabled." (R. 1232).

## III. DISCUSSION

### A. Disability Standard

To be considered disabled, a claimant must establish that they are "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The Regulations define residual functional capacity ("RFC") as "the most [a claimant] can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945. In assessing the RFC of a claimant with multiple impairments, the SSA considers all "medically determinable impairments," including

impairments that are not severe. *Id.* §§ 404.1545(a)(2), 416.945(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive

effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

### C. Analysis

Plaintiff asserts four arguments challenging the Commissioner's decision. (*See generally* Dkt. No. 14, pp. 24–37). Specifically, Plaintiff contends that the decision is flawed because: (1) it is unsupported by substantial evidence; (2) the Step Four determination was erroneous; (3) the ALJ erred in determining Plaintiff's credibility; and (4) the Appeals Council erred in rejecting Plaintiff's new evidence. (*Id*.). The Court will address each argument in turn.

### 1. Evaluation of the Medical Evidence

First, Plaintiff argues that the RFC is not supported by substantial evidence, and that the ALJ erred in affording "great weight" to Dr. Plotz's opinion because he did not consider the most recent evidence in the record. (Dkt. No. 14, pp. 24–28). In response, the Commissioner asserts that the alleged error "was harmless where the updated record remained consistent with Dr. Plotz's opinion that Plaintiff's Crohn's disease was questionable diagnosis and her symptoms were largely mild." (Dkt. No. 16, p. 7). The Commissioner points to evidence showing that Plaintiff's daily activities were normal and her "long-time treating gastroenterologist Dr. Canales appeared to change his mind about Plaintiff's Crohn's disease diagnosis." (*Id*., p. 8).

Generally, "a medical opinion is not stale simply based on its age," and "[a] more dated opinion may constitute substantial evidence if it is consistent with the record as a whole." *Reithel v. Comm'r of Soc. Sec.*, 330 F. Supp. 3d 904, 910 (W.D.N.Y 2018). Here, with regard to Plaintiff's gastrointestinal issues, the record shows that Plaintiff's gastroenterologist changed his initial diagnosis from Crohn's disease in 2009 to irritable bowel syndrome by 2016. (*See*

*e.g.*, R. 760–61, 2338–39). This change appears to be consistent with Dr. Plotz's skepticism of Plaintiff's initial diagnosis of Crohn's disease, and his suggestion that Plaintiff's symptoms would likely be far worse had she been suffering from Crohn's. (*See* R. 46–47, 1143). Similarly, Dr. Plotz's assessment that Plaintiff had only minimal physical limitations appears to be consistent with Plaintiff's daily activities and Dr. Lorensen's determination that Plaintiff had no limitations to walking, sitting, standing, and handling small objects, and only moderate restrictions to bending, reaching, and lifting. (*See* R. 271–74, 1639–40). Therefore, the Court finds that the ALJ did not err in relying on Dr. Plotz's opinion. *See Reithel*, 330 F. Supp. 3d at 910–12 (rejecting the plaintiff's staleness argument because the challenged opinion was "consistent with additional substantial medical evidence in the record, including subsequent opinions"); *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586–89 (W.D.N.Y. 2018) (same).

Plaintiff also asserts that the ALJ erred by failing to incorporate the postural and reaching limitations found by Drs. Plotz and Lorensen into the RFC, despite affording those doctors great weight. (Dkt. No. 14, pp. 26–27). Plaintiff speculates that had the VE been aware of her alleged reaching limitations, the VE would not have reached the same conclusions. (*Id.*). In response, the Commissioner argues that the ALJ's physical RFC was supported by substantial evidence and contends that "the ALJ considered that 'moderate' limitations [found by Dr. Lorensen] in bending, reaching and standing, in the context of largely normal findings, did not translate or a reaching limitation." (Dkt. No. 16, p. 10).

Although the ALJ gave Dr. Lorensen's opinion "great weight," the RFC does not specifically account for Dr. Lorensen's finding that Plaintiff suffered from "moderate restrictions bending, reaching, and lifting." (*See* R. 1230, 1640). But the ALJ appears to have reconciled this finding with the rest of Dr. Lorensen's opinion and the record as a whole. As the

Commissioner notes, Dr. Lorensen reported that Plaintiff's "cervical spine shows full flexion extension, lateral flexion bilaterally, and full rotary movement bilaterally," "full [range of motion] of shoulders, elbows, forearms, and wrists bilaterally," and noted that her "[j]oints were stable and nontender." (R. 1640). Dr. Lorensen also found that Plaintiff had full strength in her upper extremities, that her hand and finger dexterity was intact with full grip strength, and that she had no sensory deficits. (*Id.*).

In addition, Dr. Plotz found that Plaintiff was capable of "frequently" reaching in all directions. (R. 1137). Moreover, Plaintiff regularly reported normal daily activities, which included care for three young children, cooking, cleaning and laundry. (R. 271–74, 1638–40). Indeed, "it is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon 'adequate findings supported by evidence having rational probative force.'" *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008). Taken together, the Court finds that there is substantial evidence from various medical sources and Plaintiff's own reports of her daily activities to support the ALJ's decision to exclude reaching limitations from the RFC.[3] *See Dierdre R. v. Comm'r of Soc. Sec.*, No. 17-CV-0395, 2018 WL 4565769, at *8, 2018 U.S. Dist. LEXIS 162433, at *19–21 (N.D.N.Y. Sept. 24, 2018) (concluding that the ALJ did not err in discounting the consultative examiner's opinion that the plaintiff had moderate to marked limitations reaching where the record contained generally unremarkable findings); *Babcock v. Berryhill*, No. 17-CV-00580, 2018 WL 4347795, at *13, 2018 U.S. Dist. LEXIS 155024, at *38–41 (N.D.N.Y. Sept. 12, 2018) (concluding that substantial evidence supported the ALJ's

---

[3] Furthermore, any error in excluding from the RFC the moderate limitations found by Dr. Plotz was harmless because moderate limitations to repetitive lifting, bending, reaching, pushing, pulling, or carrying are not inconsistent with an RFC for a full range of light work. *See Gurney v. Colvin*, No. 14-CV-688, 2016 WL 805405, at *3, 2016 U.S. Dist. LEXIS 26198, at *8–11 (W.D.N.Y. Mar. 2, 2016) (rejecting the plaintiff's argument that the ALJ failed to consider his "moderate" reaching limitation because "moderate limitations [in "repetitive heavy lifting, bending, reaching, pushing, pulling, or carrying"] . . . . are frequently found to be consistent with an RFC for a full range of light work") (collecting cases).

decision to reject consultative examiner's opinion that plaintiff had moderate to marked limitations reaching).

Next, Plaintiff claims that the RFC fails to account for any limitations caused by her irritable bowel syndrome, even though the ALJ found that it was a severe impairment. (Dkt. No. 14, pp. 27–28). Plaintiff asserts that the ALJ's failure to include any limitations caused by her irritable bowel syndrome amounts to reversible error and speculates that "their inclusion would have substantially changed the RFC." (*Id.*). In response, the Commissioner cites medical evidence contradicting Plaintiff's claims that her symptoms were as severe as alleged and contends that "substantial evidence supports the ALJ's consideration of Plaintiff's IBS and omission of limitations relating thereto from the RFC assessment." (Dkt. No. 16, pp. 12–14).

Upon review of the record, the Court finds inconsistent evidence regarding the severity of Plaintiff's gastrointestinal issues. For example, Plaintiff reports that her symptoms could cause her to spend hours in the bathroom, and that her condition led to her being fired from a job because she could not maintain the required schedule. (*See e.g.*, R. 80–81, 1260, 1334). However, Dr. Canales's most recent treatment notes from 2016 describe her condition as "mild in intensity manifested by occasional pain [and] rare episodes of diarrhea." (R. 2338). Dr. Canales assessed that "[Plaintiff's] symptoms appear to be more functional in nature and may be related to increasing stress." (R. 2339). Similarly, in February 2016, Plaintiff's treating rheumatologist noted that Plaintiff exhibited "no GI symptoms," and also found that she "demonstrat[ed] no signs or symptoms of sacroiliitis or back limitation." (R. 2560–61). The ALJ's decision also references Plaintiff's testimony regarding intermittent changes in the severity of her bowel condition, as well as the results of objective medical testing which frequently showed "normal" or "unremarkable" results. (R. 1227, 1230). The ALJ concluded

that the "diagnostic imaging does not support her significant allegation," and found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence." (R. 1230). The ALJ also noted that "[Plaintiff's] activities of daily living are not consistent with her significant allegations," noting that her reported daily activities were normal. (R. 1230–31).

Ultimately, while Plaintiff may disagree with the ALJ's findings, the record shows factual support for his decision to omit any gastrointestinal limitations from the RFC, and the ALJ had discretion to weigh the evidence and resolve conflicts in the record. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."); *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 497 (S.D.N.Y. 2018) (noting that ALJ has authority "to resolve conflicts in the record, including with reference to a claimant's reported activities of daily living") (citing *Domm v. Colvin*, 579 F. App'x 27, 28 (2d Cir. 2014)).

In sum, the Court finds that the ALJ sufficiently accounted for Plaintiff's physical limitations and developed a well-supported RFC based on substantial evidence. Thus, remand is unwarranted on this basis.

## 2. Step Four Determination

Second, Plaintiff argues that the ALJ erred in determining that her most recent jobs qualified as "past relevant work" because her wages from those jobs did not surpass the earnings guidelines to show "substantial gainful activity" ("SGA"). (Dkt. No. 14, pp. 28–30). In response, the Commissioner argues that Plaintiff's "emphasis on the exact numbers is misplaced" because earnings are only one of several non-exclusive factors in determining whether the Plaintiff's work activity amounted to SGA. (Dkt. No. 16, pp. 15–16). The

Commissioner concedes that Plaintiff's earnings fell below the guidelines but contends that "her earnings falling just shy of the income threshold is not important given that she otherwise stayed at the positions for years." (*Id.*, p. 16).

At step four of the five-step evaluation process, "the claimant has the burden to show an inability to . . . perform past relevant work." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003). Under the Regulations, past relevant work is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). Work activity is "substantial" if it "involves doing significant physical or mental activities," and it is "gainful" if it is "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §§ 404.1572, 416.972. In determining whether a claimant's past relevant work constitutes substantial gainful activity, "primary consideration" should be given to the earnings the claimant derived from the work activity. 20 C.F.R. §§ 404.1574(a)(1), 416.974(a)(1).

Notably, this Court has previously held that the earnings guidelines merely "set a floor for earnings that presumptively constitute substantial gainful activity," and that "the ALJ may consider a claimant's past work, even if the earnings from that work fall below the guidelines." *Parker v. Astrue*, No. 06-CV-1458, 2009 WL 3334341, at *3, 2009 U.S. Dist. LEXIS 95467, at *8–11 (N.D.N.Y. Oct. 14, 2009). The Regulations clearly specify that "the fact that [a claimant's] earnings were not substantial will not necessarily show that you are not able to do substantial gainful activity." 20 C.F.R. §§ 404.1574(a)(1), 416.974(a)(1).

Here, the ALJ concluded that Plaintiff was capable of performing past relevant work as a produce clerk and a cashier checker because she "worked both of these jobs at the substantial gainful activity level, and she was at both jobs long enough to learn all of the requisite duties."

(R. 1231).  The record shows that Plaintiff worked at a gift shop (2004–2005), a home improvement store (2005–2010), a clothing store (2007–2008), and at a grocery store (2010–2012).  (R. 261, 1489).  Although Plaintiff's monthly earnings were below the SGA income guidelines in each year she was employed, there were several years in which she was close to the range.  (*See* Dkt. No. 14, pp. 29–30).  Plaintiff testified that she worked as a produce clerk for two years, working 20 hours each week at $9.45 per hour.  (R. 63–64).  She also testified that she was working full-time when she started work at the home improvement store in 2005 and worked at that job in various capacities until 2010.  (R. 68, 261).

Upon review of the record, the Court finds that Plaintiff's jobs as a cashier and a produce clerk involved significant physical and mental activities, they were the type of jobs typically performed for pay, and Plaintiff remained employed at each of those jobs for long enough to learn the requisite duties.  Specifically, Plaintiff testified that she worked at these jobs between 20 and 40 hours per week, that she was paid an hourly wage at each of them, and that she performed tasks that would normally be expected for such work, including light cleaning, food preparation, stocking shelves, and working the cash register.  (*See* R. 63–71, 281–85, 301–02).  Thus, despite the fact that Plaintiff's average monthly wages did not meet the earning guidelines of the Regulations, the Court finds no error in the ALJ's finding that Plaintiff's recent employment qualified as "past relevant work" under the Regulations.[4]  *See Fuentes v. Colvin*, 2015 WL 631969, at *10–11, 2015 U.S. Dist. LEXIS 17915, at 25–31 (W.D.N.Y. Feb. 13, 2015) (concluding that the plaintiff's earnings were "sufficiently close" to permit the court

---

[4]  The Court also notes that Plaintiff claims the ALJ's alleged error in determining past work was "not harmless error, as the ALJ should have continued to Step Five of the sequential evaluation."  (*See* Dkt. No. 14, p. 30).  However, as the Court discussed above, there was no error in the RFC determination for light work.  So, even if the ALJ had continued to step five (which he was not required to do), it appears that Plaintiff would still fail to qualify as disabled under the Grids.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, 202.20 (commonly called "the Grids" or the "Grid").

to conclude that the ALJ properly considered the prior employment as past relevant work) (collecting cases).

Plaintiff also argues that the VE's testimony was inconsistent with Plaintiff's past work because she would be unable to perform her past relevant work as she had performed it. (Dkt. No. 14, pp. 30–31). Plaintiff states that she is unable to perform her previous jobs because they required her to lift twenty to thirty pounds daily, a task she claims she is no longer capable of. (*Id.*). Notably, Plaintiff does not claim that she lacks the ability to perform the tasks of produce clerk or cashier checker as those jobs are generally performed in the economy. Instead, her argument pertains only to her alleged inability to perform the past jobs at her specific former employment. (*See id.*). As the Commissioner notes, the Regulations require *either* that Plaintiff be able to perform the work as it is generally performed, *or* as she performed it in the past. *See* 20 C.F.R. §§ 404.1560(b), 416.960(b) (stating that vocational capabilities related to past relevant work are considered "either as the claimant actually performed it or as generally performed in the national economy"). Thus, even if true, Plaintiff's claim that she cannot perform her past work is irrelevant because there is substantial evidence that she is capable of light work, as discussed above.

### 3. Credibility Determination

Third, Plaintiff claims that the ALJ erred in determining her credibility because he: (1) incorrectly weighed her daily activities and her ability to work part-time; (2) failed to cure deficiencies from the previous decision in analyzing her subjective complaints; (3) placed too much emphasis on Dr. Plotz's opinion, namely his speculation that Plaintiff was abusing her pain medications; and (4) erroneously placed the burden on her to produce objective evidence that she was unable to work. (Dkt. No. 14, pp. 31–35). In response, the Commissioner argues

that "the ALJ did in fact consider the abnormal imaging, while also noting that it was not corroborated by clinical findings." (Dkt. No. 16, pp. 16–17). The Commissioner asserts that the ALJ properly considered her daily activities and part-time work and claims that there is no evidence that the ALJ even considered Dr. Plotz's statements regarding Plaintiff's use of pain medications. (*Id.*, pp. 18–19).

The Regulations require a two-step process for the ALJ to assess a claimant's subjective symptoms. *Sloan v. Colvin*, 24 F. Supp. 3d 315, 326 (W.D.N.Y. 2014). First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529(b)-(c). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the claimant's statements considering the details of the case record as a whole. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

Here, the ALJ expressly considered Plaintiff's subjective statements about her symptoms. Specifically, the ALJ states that:

> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. This does not mean the claimant has no pain or symptoms. Rather, this finding means that the claimant has failed to produce appropriate, probative evidence as required by the Social Security Act . . . . In the absence of such evidence, significant weight cannot be given to subjective complaints, no matter how intensely expressed.

(R. 1230). The ALJ noted that, according to Plaintiff's own testimony, she was able to perform

some part-time work, care for her young children, and cook, clean, do laundry, read, manage

money, and socialize with family and friends. (*See* R. 270–80, 1230–31). The ALJ also noted

that Plaintiff's objective medical tests frequently showed "normal" results, and "both the

consultative examiner and a medical expert provided opinions with modest limitations." (R.

1230). The Court finds that the ALJ correctly followed the two-step process and committed no

error by considering Plaintiff's daily activities and recent part-time employment in his analysis.

*See Rivers v. Astrue,* 280 F. App'x 20, 23 (2d Cir. 2008) (permitting an ALJ to consider the

claimant's work that was performed during the relevant period to evaluate the claimant's work-

related capacities); *see also Hurlburt v. Berryhill*, No. 17-CV-06372, 2018 WL 1959238, at *6,

2018 U.S. Dist. LEXIS 70510, at *24 (W.D.N.Y. Apr. 26, 2018) ("A claimant's work during

the relevant period, even on a part-time or less than substantial-gainful-employment basis, may

be considered in assessing his or her functional limitations.").

Plaintiff next asserts that the ALJ mischaracterized or ignored objective medical

evidence corroborating Plaintiff's allegations about the severity of her back condition.[5] (*See*

Dkt. No. 14, p. 31). But, contrary to Plaintiff's allegations, the ALJ's decision acknowledges

that there were some abnormalities in the MRI results of Plaintiff's lumbar spine. (R. 1228).

The ALJ concluded that those findings were not corroborated by clinical findings, and

referenced Plaintiff's physical therapy records which "make it clear that [Plaintiff's] limited

range of motion is due to deconditioning, poor posture and failure to follow through with

exercises." (*Id.*). He also referenced the fact that Plaintiff was "not regularly seen by an

---

[5] The Appeals Council directed the ALJ to reconsider the objective medical evidence showing that she
had some back abnormalities that could cause the pain she alleges. (R. 1316–17).

orthopedic specialist, and she ha[d] not received any ongoing treatment for her back." (*Id.*). The ALJ's decision also relies heavily on Dr. Lorensen's consultative exam, which found that Plaintiff had "no gross limitations sitting, standing, walking, and handling small objects." (*See* R. 1230, 1640). Although Plaintiff regularly reported back pain and discomfort, "disability requires more than the mere inability to work without pain." *Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983)). Thus, merely pointing to evidence that Plaintiff experienced pain as a result of her conditions is insufficient to establish disability. Thus, the Court finds no error in the ALJ's evaluation of the objective medical evidence.

Plaintiff further claims that the ALJ's assessment "was clouded by Dr. Plotz's speculation regarding her addiction to hydrocodone." (Dkt. No. 16, p. 18). It is curious that Plaintiff would highlight this issue to the Court, since the ALJ's decision does not even mention Plaintiff's long-term reliance on opioids to manage her pain. To be sure, Dr. Plotz was not alone in his concern regarding Plaintiff's use of this medication. In fact, the record shows that at one point, Dr. Krant, one of Plaintiff's own treating providers, expressed concern regarding potential drug diversion. (R. 2561). Nonetheless, as the Commissioner notes, the record contains no evidence that Dr. Plotz's statements regarding Plaintiff's use of pain medication weighed on the ALJ's conclusions in any way. Therefore, Plaintiff's concern is entirely speculative and unsupported by the record.

Finally, Plaintiff claims that the ALJ's decision appears to shift the burden of establishing disability to her. While Plaintiff is correct that the ultimate determination of disability belongs to the Commissioner, it was Plaintiff's burden to present evidence showing that her limitations were so severe that they caused disability. *See Cage v. Comm'r of Soc. Sec.*,

692 F.3d 118, 123 (2d Cir. 2012) (noting that it is a plaintiff's burden to demonstrate disability); *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (stating that a plaintiff's inability to present evidence showing functional limitation constitutes substantial evidence that such limitation does not exist). For the reasons discussed above, Plaintiff has failed to do so.

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision was supported by substantial evidence in the record. Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). Ultimately, the ALJ conducted a legally sufficient analysis of Plaintiff's subjective complaints, discounted them based on substantial evidence, and Plaintiff's arguments to the contrary lack merit. *See Miller v. Colvin*, 85 F. Supp. 3d 742, 756–57 (W.D.N.Y. 2015) (affirming the ALJ's decision to discredit the plaintiff's subjective complaints where substantial evidence supported the ALJ's finding); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270–72 (N.D.N.Y. 2009) (same).

### 4. New Evidence

Finally, Plaintiff argues that "the Appeals Council committed harmful error in rejecting the October 2016 medical source statement from Dr. Krant which [Plaintiff] submitted with her 2016 request for review." (Dkt. No. 14, pp. 35–37). Plaintiff contends that her "new evidence" was "probative of her condition during [the relevant] period in that it sets out specific limitations[,] which she experienced due to her severe impairments," and that there was "a reasonable possibility it would have changed the outcome of the hearing." (*Id.*, p. 36). In response, the Commissioner notes that Dr. Krant's Medical Source Statement, even if it had been considered, would not have changed the outcome of the ALJ's decision because it "appears to attribute Plaintiff's inability to remain on task to depression and anxiety, two

diagnoses about which [Plaintiff] presented no arguments." (Dkt. No. 16, pp. 19–20). Further, the Commissioner asserts that Dr. Krant's opinion that Plaintiff was unable to stay on task is contradicted by Plaintiff's ability to work four to eight hours for many years and is otherwise inconsistent with the record as a whole. (*Id.*, p. 20).

The Regulations require the Appeals Council to consider "new and material evidence." 20 C.F.R. §§ 404.970(b), 416.1470(b). New evidence is "material" if it is: "(1) relevant to the claimant's condition during the time period for which benefits were denied and (2) probative." *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.* In some cases, such evidence may be relevant even if it was generated after the ALJ rendered a decision. *Id.* at 193–94.

Plaintiff contends that the Appeals Council should have been considered an October 2016 Medical Source Statement from Dr. Krant, Plaintiff's treating rheumatologist. (*See* R. 1208–12). The questionnaire was completed nearly two months *after* the ALJ's decision, but nonetheless appears to assess Plaintiff's health during the relevant period. However, Dr. Krant left the vast majority of questions blank and failed explain his findings with any supporting narrative. (*See id.*). Dr. Krant simply opined that Plaintiff's symptoms would cause constant interference with her attention and concentration, but still found that she remained "capable of 'low stress' work." (R. 1209). Therefore, the Court finds that Dr. Krant's incomplete questionnaire is not material evidence because it lacks any probative information as to Plaintiff's physical limitations. Moreover, the questionnaire does not provide any new substantive findings capable of altering the ALJ's decision, which had already considered a lengthy record that included Dr. Krant's treatment records from 2013 through 2015. (*See* R.

1621–36, 2221–32).  In sum, the Court finds that Plaintiff's new evidence would not have

changed the outcome of the ALJ's decision, and Plaintiff's claim as to error is without merit.

*See DiBlasi v. Comm'r of Soc. Sec.*, 660 F. Supp. 2d 401, 406–07 (N.D.N.Y. 2009) (holding

that remand was not warranted where "purported new evidence was merely cumulative of that

already in the record"); *Henderson v. Berryhill*, No. 16-CV-794, 2018 WL 6629301, at *4–5,

2018 U.S. Dist. LEXIS 213788, at *11–16 (W.D.N.Y. Dec. 19, 2018) (holding that remand for

consideration of new evidence was not warranted where the claimant failed to show that new

evidence was likely to have influenced the ALJ's decision regarding her applications); *Kirah D.*

*v. Berryhill*, No. 18-CV-110, 2019 WL 587459, at *5, 2019 U.S. Dist. LEXIS 23005, at *9–14

(N.D.N.Y. Feb. 13, 2019) (denying remand where the "[p]laintiff fail[ed] to demonstrate that [ ]

newly submitted evidence would "alter the weight of the evidence before the ALJ so

dramatically as to require the Appeals Council to take the case").

## IV.  CONCLUSION

After careful review of the record, the Court concludes that the ALJ applied the correct

legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case and provide a copy

of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of

the Northern District of New York.

**IT IS SO ORDERED.**

Date:   November 8, 2019
        Syracuse, New York

*Norman A. Mordue*

**Norman A. Mordue**
**Senior U.S. District Judge**